DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Central West Virginia Energy Company, | ) | |
| | ) | CASE NO. 4:05 CV 1561 |
| Appellant, | ) | |
| | ) | |
| v. | ) | (Bankr. Case No. 00-43394; |
| | ) | Adv. Case No. 05-4034) |
| Wheeling Pittsburgh Steel Corporation, | ) | |
| | ) | |
| Appellee. | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |

## I.  INTRODUCTION

This consolidated appeal involves three bankruptcy court orders.  It originated as three

separate appeals: Case No. 4:05cv1561 appealing from an order dated May 4, 2005 ("the

Declaratory Judgment Order"); Case No. 4:05cv2355 appealing from an order dated September

8, 2005 ("the Injunction Order"); and Case No. 4:05cv2621 appealing from an order dated

September 29, 2005 ("the Assignment Order").  These three appeals were consolidated under the

first case number and the issues were re-briefed in omnibus briefs filed by the parties.[1]

The parties have identified four primary issues in this consolidated appeal:

---

[1]  After this Court consolidated the three appeals, the parties were asked to submit a
consolidated Joint Appendix and omnibus briefs.  This Memorandum Opinion is based on those
consolidated documents.  See Doc. Nos. 35-38 (Joint Appendix) and Doc. Nos. 40, 41, 42
(Briefs).  For ease of reference, whenever the Joint Appendix ("JA") is cited, the Court will use
the bates-stamped page numbers.

(4:05 CV 1561)

(1)  whether the Letter Agreement of March 30, 2002 altered appellant's right to terminate the Coal Supply Agreement of November 15, 1993, in connection with a proposed joint venture;

(2)  whether the Coal Supply Agreement is a "requirements contract" for the appellee's coke-making plant and, in fact, whether this issue was even preserved for appeal;

(3)  whether the bankruptcy court acted within its discretion in granting injunctive relief; and

(4)  whether the counterclaim asserted by the appellant was actually a compulsory counterclaim which should have been raised in prior proceedings and, in the manner it was raised, constituted an impermissible collateral attack on the bankruptcy court's declaratory judgment.

For the reasons set forth below, all three of the bankruptcy court Orders appealed from are AFFIRMED.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Wheeling-Pittsburgh Steel Corporation ("WPSC") owns and operates the Follansbee Coke Plant in Follansbee, West Virginia ("the Plant") where several types of metallurgical coal are used as raw materials in the production of coke which in turn is used in the production of steel.  Central West Virginia Energy Company ("CWVEC")[2] and  WPSC are parties to a Coal Supply Agreement dated November 15, 1993 ("the Coal Supply Agreement" or "the Agreement") (JA 19).  Under the Coal Supply Agreement, which had an original term of ten (10) years, WPSC was to obtain 100% of its high volatile coking coal from CWVEC.  The initial base

---

[2]  In the record, CWVEC is sometimes referred to as "Massey," an affiliate of CWVEC. See JA 18 at 230.

(4:05 CV 1561)

price per ton of coal was $39.15, subject to annual adjustments during the first five years of the

Agreement.

On November 16, 2000, WPSC and several of its affiliates filed voluntary petitions for

reorganization under Chapter 11.  See Bankr. Case No. 00-43394.  Just prior to this date,

CWVEC had suspended shipments of coal due to WPSC's failure to pay for past shipments.  At

the time, WPSC owed CWVEC a little over $7.2 million.[3]

On September 13, 2001, after WPSC had obtained several extensions of time for filing its

bankruptcy reorganization plan, CWVEC filed a motion to compel WPSC to either assume or

reject the Coal Supply Agreement, which was executory in nature.[4]  (JA 1).  WPSC had the right

under § 365(a) and (d)(2) of the Bankruptcy Code to either assume or reject the Agreement as

part of the reorganization plan.[5]  Since the reorganization plan did not seem to be forthcoming,

---

[3]  In December 2000, the parties apparently reached an agreement to resume shipments
and arranged for wire-transfer payments for those shipments.  It seems that payments for those
shipments have remained current.

[4]  "The Bankruptcy Code furnishes no express definition of an executory contract, see 11
U.S.C. § 365(a), but the legislative history to § 365(a) indicates that Congress intended the term
to mean a contract 'on which performance is due to some extent on both sides.'  H.R.Rep. No.
95-595, p. 347 (1977), see S.Rep. No. 95-989, p. 58 (1977)."  N.L.R.B. v. Bildisco and Bildisco,
465 U.S. 513, 522 n.6 (1984).

[5]  Subject to court approval, 11 U.S.C. § 365(a) allows the trustee (or debtor-in-
possession) to either assume favorable pre-petition executory contracts or reject unfavorable pre-
petition executory contracts of the debtor.

Generally, if the debtor assumes a pre-petition executory contract, the contract is
effectively converted into a post-petition contract, so that both the debtor and the
contracting party can still compel the other to perform.  If the debtor rejects the
pre-petition executory contract, the contract is treated as having been terminated
prior to the debtor's filing of bankruptcy, so that the contracting party's claim for

(continued...)

3

(4:05 CV 1561)

CWVEC, as was its right, moved the bankruptcy court to force WPSC to make a decision since CWVEC was unhappy with the arrangement under which it had to supply WPSC with coal at the contract rate significantly less than the then-current market rate and, at the same time, was not free to sell its product elsewhere.  The motion was denied on December 6, 2001 (JA 5) because WPSC, as debtor-in-possession, was not yet in a position to know whether the Coal Supply Agreement was a benefit to the bankruptcy estate[6] and whether the estate could make a cure payment of over $7 million, which would be required if the Agreement were incorporated into the reorganization plan.[7]

On March 30, 2002, CWVEC and WPSC entered into a Letter Agreement (JA 20) amending the Coal Supply Agreement, which was simultaneously assumed as amended by

---

[5] (...continued)
damages (if any) has the same status as all other pre-petition claims.

Phar-Mor, Inc. v. Strouss Bldg. Associates, 204 B.R. 948, 951 (N.D. Ohio 1997).

[6] In re Sudbury, Inc., 153 B.R. 776, 778 (Bankr.N.D. Ohio 1993), explains the effect of rejection or assumption of a contract as follows:

> Section 365 is designed to give the trustee the option of assuming contracts where performance by a third party will benefit the estate or to forego the third party's performance where the benefit to the estate will be less than the cost.  If the contract is assumed, the third party must perform and the debtor must render at full value the debtor's bargained for performance on which the third party's performance was conditioned.  If the contract is rejected, the third party is not obligated to perform but has only a prepetition claim for its damages.

[7] The plan of reorganization was not confirmed until June 18, 2003.  See Bankr. Case No. 00-43394, Doc. No. 2130.

4

(4:05 CV 1561)

WPSC in its Chapter 11 reorganization plan.[8]  A major portion of the dispute in this appeal

involves the meaning of Article XX of the Coal Supply Agreement, as amended by the Letter

Agreement.

On May 2, 2002, the bankruptcy court issued an order approving WPSC's assumption of

the Coal Supply Agreement, as amended by the Letter Agreement.  (JA 7).

On December 28, 2004, WPSC announced that it had entered into a non-binding letter of

intent to enter a joint venture with flat rolled sheet steel producer Severstal North America, Inc.

("Severstal").  Under the agreement, if consummated, Severstal would contribute $140 million

over four years to rebuild the Follansbee Coke Plant and would pay WPSC $20 million; in return

it would own 50% of the Plant (which WPSC would continue to operate) and would be entitled

to 50% of the coke produced at the Plant.  The Coal Supply Agreement, as amended, would be

assigned to the joint venture, making both Severstal and WPSC liable to CWVEC for all

obligations under the Coal Supply Agreement.  (JA 8 at 100-101).

On February 10, 2005, WPSC sought bankruptcy court approval of this proposed joint

venture and, in particular, for leave to assign the Coal Supply Agreement to the joint venture.

(JA 8).  It also filed Adversary Proceeding No. 05-4034 against CWVEC, seeking a declaration

of the parties respective rights.  (JA 9).

CWVEC opposed the assignment arguing that, because the reorganization plan had

already been confirmed, the bankruptcy court had no jurisdiction and that, in any event, CWVEC

---

[8]  In the Letter Agreement, the Coal Supply Agreement was also extended to 2010 and new base prices were set; WPSC agreed to make a cure payment of $7,205,515.56 plus a retroactive price adjustment of $724,780.

(4:05 CV 1561)

needed many items of information before it could determine the merits of the joint venture.

CWVEC did not argue that the Letter Agreement did not <u>permit</u> the assignment; rather, it only

argued that it could not adequately determine whether its rights would be protected.  (JA 10).

On April 19, 2005, the bankruptcy court conducted a hearing with respect to the proposed

assignment and the adversary proceeding.  (JA 18).  Prior to the hearing, the parties were

allowed to brief their respective interpretations of the Coal Supply Agreement, as amended by

the Letter Agreement.  CWVEC took the position that the second paragraph of Art. XX of the

Coal Supply Agreement had been unaffected by the Letter Agreement and that the formation of a

joint venture constituted a "transfer" under that second paragraph.  CWVEC believed, therefore,

that it had the right to terminate the Coal Supply Agreement and it wanted to do so.  (JA 10).

WPSC argued that CWVEC was simply trying to escape its contractual obligations under the

Coal Supply Agreement.  WPSC argued that the Letter Agreement's provision for Contract

Assignment completely overrode Art. XX and permitted both the formation of the joint venture

and the assignment of the Coal Supply Agreement, as amended, to that new entity without any

change to CWVEC's obligations.  (JA 11).

On May 4, 2005, the bankruptcy court issued a Memorandum Opinion (JA 27) and Order

(JA 28) (collectively, the "Declaratory Judgment Order")[9] declaring the rights of the parties to

the adversary proceeding with respect to the Coal Supply Agreement, as amended.  The court

ruled that WPSC would be entitled to assign its rights under the Agreement to a joint venture yet

---

[9]  This Memorandum Opinion and Order was entered in both the bankruptcy case (No.
00-43394, Doc. No. 2657) and the adversary case (No. 05-4034, Doc. No. 22).

6

(4:05 CV 1561)

to be formed; that CWVEC would be allowed to challenge the assignment if it believed the new arrangement would not provide equal or superior performance; and that any approved assignment would not affect the continued validity of the Coal Supply Agreement, as amended (that is, the assignment would not constitute grounds for CWVEC to terminate the Agreement). The May 4, 2005 Declaratory Judgment Order is the subject of the first appeal. (JA 29).

After the bankruptcy judge issued the May 4, 2005 Declaratory Judgment Order, WPSC filed a breach of contract complaint in the Circuit Court of Brooke County, West Virginia ("the West Virginia action") seeking damages based on state contract law for CWVEC's continued post-confirmation refusal to deliver coal to WPSC.[10]  CWVEC removed the action to the United States District Court for the Northern District of West Virginia. CWVEC answered and counterclaimed for a declaratory judgment that it was only required to supply coal to WPSC, not to any new entity. CWVEC asked the court to declare that, if the joint venture were consummated, CWVEC would not be required to supply all the coking coal needed at the Plant, in particular, that it would not be required to supply any coal that would be used to produce coke that would go to Severstal.

WPSC moved the bankruptcy court to enjoin CWVEC from proceeding with its counterclaim in the West Virginia action. (JA 33). After the parties stipulated to a TRO (JA 34), the bankruptcy court conducted a hearing on August 16, 2005 (JA 37) and, on September 8,

---

[10]  The bankruptcy court first issued its declaratory judgment verbally on the record at the end of a hearing conducted on April 19, 2005. Thereafter it filed its written ruling on May 4, 2005. It appears from an electronic docket available to this Court that the West Virginia action was filed on April 27, 2005, after the oral decision but before the written decision of the bankruptcy court.

(4:05 CV 1561)

2005, it issued a permanent injunction prohibiting CWVEC from proceeding with its

counterclaim and further prohibiting CWVEC from reducing the amount of coal it was supplying

under the Coal Supply Agreement, as amended.  (JA 38).  The September 8, 2005 Injunction

Order is the subject of the second appeal.  (JA 39).

On September 29, 2005, the bankruptcy court issued an order in the bankruptcy

proceeding (JA 42) (the "Assignment Order") granting WPSC's motion for an order specifically

approving the assignment of the Coal Supply Agreement to Mountain State Carbon, LLC (the

joint venture formed by WPSC and Severstal).  The September 29, 2005 Assignment Order is the

subject of the third appeal.  (JA 44).

As already noted, all three appeals have been consolidated and this Court has for review

the Declaratory Judgment Order of May 4, 2005, the Injunction Order of September 8, 2005, and

the Assignment Order of September 29, 2005.

### III.  DISCUSSION

### A.  Standard of Review

This Court reviews the bankruptcy court's conclusions of law *de novo*; findings of fact

are reviewed for clear error.  In re Commonwealth Institutional Securities, Inc., 394 F.3d 401,

405 (6th Cir. 2005).  To the extent the bankruptcy court may have been interpreting one of its

own orders, that interpretation is entitled to considerable deference on appeal.  See, e.g., Huguley

v. General Motors Corp., 999 F.2d 142, 145 (6th Cir. 1993); Kendrick v. Bland, 931 F.2d 421,

423 (6th Cir. 1991).

(4:05 CV 1561)

Interpretation of a contract is a question of law subject to *de novo* review.   <u>Wood v. Accordia of West Virginia, Inc.</u>, 618 S.E.2d 415, 420 (W.Va. 2005).[11]

The bankruptcy court's decision to enter an injunctive order is reviewed for abuse of discretion.  <u>In re Dublin Securities, Inc.</u>, 133 F.3d 377, 380 (6th Cir. 1997).  "An abuse of discretion is defined as a definite and firm conviction that the [lower] court committed a clear error of judgment."  <u>Id</u>. (citing <u>Bowling v. Pfizer, Inc.</u>, 102 F.3d 777, 780 (6th Cir.1996)).

**B.  The Issues Raised and Briefed**

As noted in the Introduction, the parties have identified four issues on appeal. The first issue stands alone and will be analyzed by itself.  The other three issues are related and will be examined together.

> **1.  Whether the Letter Agreement of March 30, 2002 altered CWVEC's right to terminate the Coal Supply Agreement of November 15, 1993, in connection with a proposed joint venture**

Resolution of this issue involves the construction of Article XX of the Coal Supply Agreement and the Letter Agreement as they relate to assignment of the Agreement.

On May 4, 2005, the Bankruptcy Court concluded, contrary to CWVEC's position "that Article XX of the original Coal Supply Agreement does not contain two wholly independent and separate provisions -- one dealing with assignment and one dealing with termination in the event of a sale of the Coke Plant."  (JA 27 at 541).  The Bankruptcy Court declared the following: (1) that WPSC was entitled to assign the Agreement "to any entity, subject only to bankruptcy court

---

[11]  Article XIX of the Coal Supply Agreement expressly provides that it is subject to West Virginia contract law.  (JA 19 at 414).  Therefore, this Court turns to West Virginia case law for guidance on contract interpretation.

9

(4:05 CV 1561)

approval[;]" (2) that "CWVEC may oppose such assignment . . . if it believes that the assignee does not provide assurance of performance that is equal to, or superior to, the assurance provided by [WPSC;]" and (3) "CWVEC is not entitled to terminate the Coal Supply Agreement or to renounce its obligations thereunder in the event of such assignment [approved by the bankruptcy court.]"  (Id. at 543).

The actual assignment of the Agreement had not yet occurred because WPSC was still in the process of completing the relevant joint venture between itself and Severstal.  On September 29, 2005, on WPSC's motion and over the objection of CWVEC, the bankruptcy court approved the assignment of the Coal Supply Agreement to Mountain State Carbon, LLC, the new joint venture.  (JA 42).

There is no dispute that, by the express terms of the Agreement, West Virginia law governs its construction.  (JA 19 at 414).  Under West Virginia law, if a contract is unambiguous, its interpretation does not permit consideration of parol evidence.  Kopf v. Lacey, 540 S.E.2d 170, 175 (W.Va. 2000).  Further, when a contract is modified by agreement of the parties, any provisions in the original contract that are inconsistent with the modification will be disregarded.  Consolidation Coal Co. v. Mineral Coal Co., 126 S.E.2d 194, 201 (W.Va. 1962).

CWVEC maintains that Article XX contains separate provisions for assignment of the Agreement and transfer of the Plant, such that WPSC could assign the agreement without transferring the Plant.  Therefore, it takes the position that only the assignment portion of Article XX was modified by the Letter Agreement, but not the transfer provision.

10

(4:05 CV 1561)

Both WPSC and the bankruptcy court viewed Article XX as containing one provision dealing with assignment, but containing a limitation that CWVEC had the right to terminate the Agreement if the assignee was <u>not</u> a subsidiary of the WPSC.

This Court concludes that the bankruptcy court got it right.  For ease of reference, the Court sets forth Article XX and the relevant portion of the Letter Agreement below:

| Art. XX - Coal Supply Agreement<br>(JA 19 at 414) | Letter Agreement of 3/30/02 (as it relates to Art. XX)<br>(JA 20 at 422-23) |
| --- | --- |
| <u>ASSIGNMENT</u><br><br>This Agreement shall inure to the benefit of and be binding on the parties hereto and their respective successors and assigns; but this Agreement may not be assigned by either party, except as indicated below, without the prior written consent of the other, except that either party may without the written consent of the other assign or pledge for financing purposes this Agreement or any monies due or to become due hereunder.  [**] Seller [CWVEC] may, without the consent of Customer [WPSC], assign this Agreement (in whole or in part) to any of the wholly-owned subsidiaries of A.T. Massey Coal Company, Inc., provided that Seller and A.T. Massey Coal Company, Inc. each guarantees full performance of this Agreement by said assignee.  Customer may also without the consent of Seller assign this Agreement (in whole or in part) to any of its wholly-owned subsidiaries to which it has conveyed the Plant or its operations, provided that any assignment of this Agreement shall not relieve Customer from its obligations thereunder.  Customer shall not sell, lease, transfer or convey all or any substantial portion of the Plant, or license out its operation, to any person or entity unless such person or entity assumes the obligations of Customer hereunder.  Any such assignment of this Agreement shall not relieve Customer from its obligations hereunder.<br>In the event of any such sale, lease, transfer, conveyance or licensing to any person or entity other than a wholly-owned subsidiary of Customer, Seller shall have the right, at its option, to terminate this Agreement.  During the first two (2) years of the term of this Agreement, the Customer shall, in addition to the foregoing requirements, not assign this Agreement to an unaffiliated purchaser of the coke making facilities unless the Purchaser's performance hereunder is guaranteed by Customer's parent company. | <u>Contract Assignment</u>:  [WPSC] may assign this Agreement to any corporation, partnership or other entity or person provided that such assignee assumes all of [WPSC]'s obligations under the Agreement, as amended herein.  If such assignment is made during the pendency of the current bankruptcy case, such assignment is subject to approval by the Bankruptcy Court, and may be opposed by CWVEC if CWVEC believes that the assignee does not provide assurance of performance that is equal to, or superior to, the assurance provided by [WPSC].  If such assignment occurs when the Chapter 11 case is no longer pending, then such assignment shall be subject to approval by CWVEC's designated credit committee, which approval shall not be unreasonably withheld.  Any such assignment shall be set forth in a formal letter agreement executed by CWVEC, [WPSC], and such assignee. |

11

(4:05 CV 1561)

CWVEC had tried to argue before the bankruptcy court that the "Contract Assignment" provision in the Letter Agreement could be (and should be) simply inserted into Article XX after the first sentence (i.e., at the point indicated by "[**]" in the quotation above).  This Court rejects that argument as being completely unfounded.  If the parties had intended that result, they could have simply said so in the Letter Agreement.

Although Article XX in the Coal Supply Agreement is a little long-winded, in its simplest terms the Article states as to WPSC's rights (at the end of paragraph one) that WPSC has the right to assign the Agreement to any person or entity so long as that person or entity assumes WPSC's obligations under the Agreement, but (at the beginning of paragraph two) if WPSC were to assign the Agreement to an entity that is not its wholly-owned subsidiary, CWVEC would have the right to terminate the Agreement.  Article XX must be read as a whole. It is one provision dealing with "Assignment."

The Letter Agreement provision also deals with "Assignment."  It continues to state that WPSC may assign the Agreement to any person or entity; however, it removes CWVEC's termination rights.  Instead, it subjects any assignment to approval by the bankruptcy court during the pendency of the bankruptcy proceedings (in which case CWVEC can challenge the assignment for specified reasons) or to approval by CWVEC's designated credit committee if the bankruptcy case is no longer pending.

CWVEC argues that the bankruptcy court improperly considered parol evidence.  Based on evidence obtained at the April 19, 2005 hearing, the bankruptcy court seemed to examine the intent of the parties at the time they entered into the Letter Agreement.  See JA 27 at 542.

12

(4:05 CV 1561)

However, it did so after first examining and interpreting the four corners of Article XX and the Letter Agreement.  Since the same conclusion has been reached by this Court without consideration of intent of the parties, the Court concludes that consideration of parol evidence, if there was such consideration, amounted to harmless error because the result is the same with or without that evidence.

Accordingly, the Court finds no error with respect to the bankruptcy court's ruling on this issue.  To that extent, both the May 4, 2005 Declaratory Judgment Order and the September 29, 2005 Assignment Order are both affirmed.

**2.  Whether the Coal Supply Agreement is a "requirements contract" for the WPSC's coke-making plant and, in fact, whether this issue was even preserved for appeal**

**3.  Whether the bankruptcy court acted within its discretion in granting injunctive relief**

**4.  Whether the counterclaim asserted by the CWVEC was actually a compulsory counterclaim which should have been raised in prior proceedings and, in the manner it was raised, constituted an impermissible collateral attack on the bankruptcy court's declaratory judgment**

These three issues are conceptually intertwined and will be discussed together.  Some procedural history will be helpful.

In its May 4, 2005 Declaratory Judgment Order, the bankruptcy court made the simple statement that the Agreement was a "requirements contract."[12]  Not long after, on May 31, 2005,

---

[12]  In the context of that order, the statement appears to be dictum, since it was made not

(continued...)

13

(4:05 CV 1561)

CWVEC removed to federal court a West Virginia state court action which WPSC had filed[13]

seeking damages for CWVEC's post-confirmation failure to make coal deliveries.[14]  After

removal, CWVEC filed an answer, including a counterclaim which sought a declaration that the

Agreement was a requirements contract only for facilities existing on the effective date of the

Coal Supply Agreement, but <u>not</u> for any joint venture involving Severstal.  (JA 33 at 580, 592-

93).

     WPSC moved the bankruptcy court to enjoin CWVEC from proceeding with the

counterclaim, which WPSC believed was an end-run around the bankruptcy court's May 4, 2005

Declaratory Judgment Order.  WPSC also argued that CWVEC's counterclaim was compulsory

and had been waived when it was not raised in the adversary proceeding.  CWVEC opposed the

motion on the merits.  In addition, since the appeal from the May 4, 2005 Order was already

pending at the time WPSC filed its motion for injunction, CWVEC also argued that the

bankruptcy court did not have jurisdiction to rule on WPSC's motion.

     The bankruptcy court conducted a hearing on August 16, 2005.  It ruled orally from the

bench (<u>see</u> JA 37 at 732-49) and then issued a two-page written ruling on September 8, 2005

---

[12] (...continued)
so much as a statement in its own right, but as support for the ultimate conclusion that WPSC would be entitled to assign the Coal Supply Agreement to a joint venture without fear of termination of the agreement by CWVEC.

[13] CWVEC asserted in a bankruptcy court brief that this action had been filed on or about April 27, 2005.  <u>See</u> JA 35 at 611.  It was removed to the U.S. District Court for the Northern District of West Virginia.

[14] Confirmation of the reorganization plan had occurred on June 18, 2003.  <u>See</u> Bankr. Case No. 00-43394, Doc. No. 2130.

14

(4:05 CV 1561)

permanently enjoining CWVEC from both pursuing its counterclaim and reducing its coal

deliveries under the Agreement. (JA 38). The bankruptcy court also declared that it had the

authority, notwithstanding the appeal of the May 4, 2005 Declaratory Judgment Order (which

was already then-pending), to rule on the injunction motion because it was merely enforcing, not

enlarging upon, its prior orders. Although CWVEC has argued before this Court that the

bankruptcy court had no jurisdiction to issue its September 8, 2006 Injunction Order, there is no

need to discuss the issue at length. This Court agrees that the bankruptcy court acted within its

jurisdiction, notwithstanding the pending appeal.

At the August 16th hearing, the bankruptcy court also orally articulated its reasons for

concluding that CWVEC's counterclaim was compulsory and should have been raised as part of

the adversary proceeding. It stated:

> [WPSC]'s adversary proceeding sought a declaration that it could assign
> the coal supply agreement to the joint venture and that [CWVEC] could only
> object based upon the, quote, assurances of performance to be provided by the
> assignee, i.e., a joint venture. [WPSC]'s adversary complaint sought a declaration
> that the assignment of the coal supply agreement will not affect the continuing
> validity and enforceability of the coal supply agreement and will not entitle
> [CWVEC] to terminate it or to renounce its obligations thereunder. This
> adversary Complaint encompassed far more than just title, Section 20 of the
> agreement.
> The current counterclaim deals with the same subject. The counterclaim
> in the West Virginia litigation is logically related to the subject matter of the
> adversary proceeding. By arguing that it's not required to honor the coal supply
> agreement in its entirety but that its obligations will be limited to the coal supply
> that is proportionate to the coke that will be used only by [WPSC], [CWVEC] is
> making an argument about the continuing validity and enforceability of the coal
> supply agreement.
> [CWVEC]'s counterclaim in another Court is an attempt to circumvent the
> May 4th, 2005, order of this Court. [CWVEC] was required to raise the current
> counterclaim in its adversary proceeding because it arises directly out of and

15

(4:05 CV 1561)

> relates to the right of [WPSC] to assign the coal supply agreement to the joint venture.

(JA 37 at 737-38).

Having compared the complaint in the adversary proceeding (JA 9) to the counterclaim in the state court proceeding removed to federal court (JA 33, at 590-93), this Court concludes, as did the bankruptcy court, that CWVEC's counterclaim was essentially asking another court to rule on an issue already resolved by the bankruptcy court.  Therefore, if a counterclaim were to be brought, it should have been brought in the context of the adversary proceeding in bankruptcy court.

That having been said, however, this Court is not convinced that a compulsory counterclaim was the only way (or even a necessary way) of raising the question of whether the Coal Supply Agreement, as amended, was a "requirements contract" for the entire newly-formed joint venture.  This issue was already inherently contained in the claims of the adversary complaint.

This brings the Court to the sole remaining issue: whether the bankruptcy court erred in declaring the Agreement a requirements contract.

Apparently, the fundamental problem with the bankruptcy court's declaration is its result: since the Follansbee Plant has been absorbed into a joint venture, the bankruptcy court's ruling requires CWVEC to supply coking coal to the entire joint venture, which includes Severstal. CWVEC does not seem to challenge having to supply coal to the Follansbee Plant, but it does challenge having to supply coal to the joint venturer Severstal at the below-market price set by

16

(4:05 CV 1561)

the Agreement.[15]  The challenge is especially important to CWVEC since the bankruptcy court

also ruled, and this Court has now affirmed, that the Coal Supply Agreement, as amended,

eliminated CWVEC's right to terminate the Agreement upon transfer or sale of the Follansbee

Plant.

WPSC argues that CWVEC never challenged this "requirements" finding before the

bankruptcy court or in its appeal from the May 4, 2005 Declaratory Judgment Order and,

therefore, waived the issue.  CWVEC argues that it was blind-sided by the bankruptcy court's

declaration during the August 16, 2005 hearing that its May 4, 2005 Order (already on appeal)

had made a conclusive finding that the Agreement was a "requirements contract" for the joint

venture.[16]  It argues here, as it did unsuccessfully before the bankruptcy court on August 16,

2005, that the "requirements" question should not have been addressed in the May 4, 2005 Order

because the issue had not been raised in the Adversary Complaint[17] and was never presented to

the bankruptcy court by way of evidence, law or argument at the April 2005 hearing.  In the

alternative, CWVEC argues here that if the bankruptcy court's consideration of the issue was

---

[15]  Under the joint venture, Severstal became 50% owner of the Plant and was entitled to 50% of the coke produced there.

[16]  When CWVEC came to understand the bankruptcy court's position on this matter, it promptly filed a motion in this Court (Doc. Nos. 16, 17) seeking an extension of time to identify and brief the issues on appeal.  This Court never officially ruled on that motion because of the subsequent decision to consolidate the appeals.

[17]  The Adversary Complaint brought by WPSC prayed for declarations by the bankruptcy court that WPSC was entitled to assign it rights under the Agreement to an as-yet unformed (at the time) joint venture; that CWVEC could oppose the assignment on the ground that the assignee would not assure performance equal or superior to that of WPSC; and that the assignment would neither affect the continued enforceability of the Agreement nor permit CWVEC to terminate the Agreement.  See JA 9.

17

(4:05 CV 1561)

proper, it should have found the Agreement ambiguous and should then have considered parol

evidence to decide the issue.

WPSC asks this Court to declare that the issue was not preserved for appeal. The Court

rejects that argument. It does appear possible that CWVEC was blind-sided and attempted

unsuccessfully to raise its arguments before the bankruptcy court on August 16, but was

rebuffed. This Court will, therefore, examine the issue of whether the bankruptcy court erred in

declaring the Coal Supply Agreement, as amended, to be a "requirements contract" for the entire

joint venture.

This issue involves a question of contract interpretation. CWVEC argues that the Coal

Supply Agreement, as amended, was ambiguous and required consideration of parol evidence.

According to CWVEC, the ambiguity is found in Article II, Section 1 of the Coal Supply

Agreement which provides that "the quantity of coal to be sold and purchased . . . is one hundred

percent (100%) of the high volatile coking coal required (the "Requirements") for [WPSC]'s

facilities existing on the date of this Agreement." (JA 19 at 388, underlining added).

"Facilities" is not defined anywhere in the Agreement. The bankruptcy court ruled that the

Agreement was a requirements contract for the Follansbee Plant (which is now part of the joint

venture with Severstal). CWVEC argues that the Agreement was a requirements contract for

WPSC's entire steel-making operation, which included but was not limited to the Plant. By

extension, therefore, CWVEC argues that the Agreement was not a requirements contract for the

Follansbee Plant.

18

(4:05 CV 1561)

As a general principle, it is true that, when a contract is ambiguous, parol evidence is permitted.  However, when parties to a contract enter into a separate contract modifying the existing contract, any provisions in the original contract that are inconsistent with the modification are to be disregarded.  Consolidating Coal Co. v. Mineral Coal Co., 126 S.E.2d 194, 201 (W.Va. 1962).  There is a difference between an ambiguity in a single contract and inconsistencies between an original contract and a modifying contract.

In this case, the bankruptcy court declared that the Agreement, as amended, was not ambiguous.  (See, JA 27 at 541; JA 37 at 748).  Even so, it did seem to rely upon parol evidence collected at the two hearings to construe the meaning of the Agreement, as amended.

This Court concludes that there is an ambiguity in the Article II, Section 1 of the Coal Supply Agreement which is then exacerbated by the Letter Agreement.  Parol evidence is necessary.  There is sufficient evidence in the record to reach a conclusion *de novo*.

Article II of the original Coal Supply Agreement executed on November 15, 1993 provided, in relevant part:

TONNAGE AND DELIVERIES

Section 1.  Subject to the provisions hereof, the quantity of coal to be sold and purchased during the term of this Agreement is one hundred percent (100%) of the high volatile coking coal required (the "Requirements") for Customer's [WPSC's] facilities existing on the date of this Agreement.  The Customer's Requirements are predicated on its standard practice of blending high volatile and low volatile coking coal.  The Customer does not employ mid-volatile coking coal in its blending practice and would not do so unless its low volatile requirements ceased to be available.  In no case, however, shall high volatile coking coal comprise less than seventy percent (70%) of all the coking coal acquired by Customer from all sources during any Contract Year. . . .

* * *

19

(4:05 CV 1561)

>Section 3.  The coal shall be directed for delivery to Customer's
>Follansbee Coke Plant ("Plant") in Brooke County, West Virginia.  . . .

(JA 19 at 388-89).[18]  When the Agreement was amended by the Letter Agreement of March 30,

2002, the Letter Agreement stated, in relevant part as follows:

>Term:          2002-2010 (Seven (7) year extension)
>Tonnage:       Per current Agreement
>Specification: Per current Agreement

(JA 20 at 421).  The "current Agreement" was identified as the November 15, 1993 Coal Supply

Agreement.  Therefore, the Letter Agreement did not change the fact that the tonnage was to be

100% of the Requirements for the "facilities existing on the date of this Agreement."  The

ambiguity is definitely in the word "facilities."  CWVEC argues that "facilities" refers to

WPSC's integrated steel-making facilities, which included both its operations complex in

Steubenville, Ohio <u>and</u> Coke Plant in Follansbee, West Virginia which had been identified as the

location for delivery of the Requirements.  WPSC argues that "facilities" refers only to the

Follansbee Plant, because that was the only location where WPSC used high volatile coking

coal.

Even though "facilities" is not defined in the Agreement, its meaning is clearly

circumscribed by the fact that the high volatile coking coal being bought and sold under the

Agreement was whatever amount was needed to meet the requirements of the "facilities."  Since

parol evidence establishes that the Follansbee Plant was the only location that had <u>any</u>

---

[18]  At the April 19, 2005 hearing, Mark Bollinger, WPSC's Director of Procurement, testified that low volatile coking coal was obtained by WPSC from Bluestone Corporation.  (JA 18 at 243).

(4:05 CV 1561)

requirements for the high volatile coking coal, it follows that the Follansbee Plant was the

"facilities" referred to in the Agreement.[19]

When the Coal Supply Agreement was amended by the Letter Agreement to allow for

assignment of the Agreement to any entity or person subject only to approval by either the

bankruptcy court or CWVEC's credit committee, the phrase "facilities existing on the date of

this Agreement" became an inconsistent phrase.  Clearly, the amendment contemplated the

possibility that the Agreement would be assigned to some entity not existing as of November 15,

1993.  To the extent that the phrase was rendered inconsistent by the Letter Agreement, the

phrase must be disregarded.[20]

The Court finds no error in the bankruptcy court's conclusion that the Agreement, as

amended, was a requirements contract for the Follansbee Plant and, by extension, became a

requirements contract for the joint venture formed between the Follansbee Plant and Severstal

---

[19] CWVEC tries to argue that a single Plant must be referred to as "facility" not "facilities."  While perhaps technically correct, the Court does not find this to be a very compelling argument, particularly in view of the fact that, in the very same paragraph as one finds the reference to "facilities," one also finds "Requirements" (i.e., a plural word) making reference to "quantity" (a singular word).  Apparently, the drafter of this Agreement was not too worried about syntax and, therefore, syntax supplies no assistance in construing the Agreement.

[20] Because the bankruptcy court found no ambiguity, it would not permit parol evidence at the hearing.  However, it did permit WPSC to proffer what the evidence would have been had it been permitted.  WPSC proffered that Michelle Proia, in-house counsel for WPSC at the relevant time, would have testified that because CWVEC was pushing WPSC to assume the Agreement as part of the reorganization plan and to make a cure payment in excess of $7 million, WPSC "would not approve the assumption of the contract without assurance that it could be freely assigned to anybody, whether in connection with a sale of the coke plant or otherwise."  (JA 18 at 258).

(4:05 CV 1561)

once the assignment of the Agreement to that joint venture was approved by the bankruptcy

court.


**IV.  CONCLUSION**

      Having reviewed each of the four issues raised by the three consolidated appeals, the

Court AFFIRMS the May 4, 2005 Declaratory Judgment Order, the September 8, 2005

Injunction Order, and the September 29, 2005 Assignment Order.

      IT IS SO ORDERED.



  _May 24, 2006_____         _s/ David D. Dowd, Jr._____
Date                             David D. Dowd, Jr.
                                  U.S. District Judge